IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN RE: ) | CASE NO.   8:03CV437 |
| ) | MDL NO.    1597 |
| ) | |
| UNION PACIFIC RAILROAD ) | MEMORANDUM AND ORDER |
| EMPLOYMENT PRACTICES ) | |
| LITIGATION ) | |

This matter is before the Court on the Plaintiffs' Motion for Partial Summary Judgment on First Claim for Relief. (Filing No. 182). The Plaintiffs submitted briefs (Filing Nos. 117 and 201) and exhibits (Filing Nos. 118, 183, and 201) in support of their motion, and the Defendant submitted, under seal, a brief (Filing No. 193) and exhibits (Filing No. 194) in opposition. The Court has also considered the brief of Amici Curiae (Filing No. 198). For the reasons stated below, the Plaintiffs' Motion for Partial Summary Judgment will be granted.

**FACTS**

The Plaintiff class that has been certified for purposes of this class-action multi-district litigation is: "All females employed by Union Pacific Railroad Company after February 9, 2001, enrolled in one of the Agreement Plans who used prescription contraception, at least in part for the purpose of preventing pregnancy, without insurance reimbursement from said Plan." (Filing No. 180, p. 13). The First Claim for Relief on which the representatives of the Plaintiff class ("Plaintiffs") seek summary judgment alleges that the Defendant, Union Pacific Railroad Company ("Union Pacific"), has discriminated against the Plaintiffs by providing health insurance benefits that selectively exclude all Federal Drug Administration ("FDA") approved prescription contraception, in violation of

42 U.S.C. § 2000e *et seq.* ("Title VII") as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) ("PDA").[1]

There are no genuine issues of material fact.  The Plaintiffs submitted their statement of facts in compliance NECivR 56.1(a), and the Defendant, Union Pacific Railroad Company ("Union Pacific") has not contested those facts, although Union Pacific has taken issue with some of the inferences the Plaintiffs have drawn from those facts.  Accordingly, the Plaintiffs' statement of material facts is "<u>deemed admitted</u>."  NECivR 56.1(b)(1)(emphasis in original).  Union Pacific presented its own "counter-statement of undisputed material facts," and the Plaintiffs have not contested those facts in their Reply Brief.

Union Pacific, an employer subject to Title VII, has approximately 48,000 employees.[2]  Of those, approximately 1,300 are females covered by collective bargaining agreements ("agreement employees").[3]  Union Pacific estimates that 450 agreement employees are females of child-bearing age.[4]   Union Pacific provides health insurance

---

[1] Each Complaint and Amended Complaint in the consolidated actions asserts essentially the same claim in its First Claim for Relief.  See, *e.g.*, Filing No.1 herein, at paragraph 7.

[2] See Fitzgerald v. Union Pacific, 8:04cv188, First Amended Complaint, paragraph 22, and Answer to First Amended Complaint, paragraph 22.

[3] Declaration of Geneva S. Dourisseau, Filing No. 194, Ex. 1 ("Dourisseau Decl. I"), paragraph 2a.

[4] *Id.* at paragraph 2b; Union Pacific Brief in Opposition to Motion for Partial Summary Judgment, Filing No. 193 ("U.P. Brief"), p. 8.  It is unclear how Union Pacific calculates the number of female agreement employees it considers to be of child-bearing age.  Although the U.S. Department of Health and Human Services maintains birthrate statistical data for women from age 10 through 54, *see* National Center for Health Statistics, Health, United States, 2004, at p. 109, it appears that Union Pacific assumes that a woman's child-bearing years have ended well before the age of 50.  The total number of "agreement employees," male and female, is also not clear from the record.

benefits to its male and female agreement employees through five different plans ("Plans").[5]

The Plans provide coverage for a variety of prescription drugs, including drugs that the Plaintiffs describe as "preventive," such as blood-pressure and cholesterol lowering prescription drugs to prevent heart disease; hormone replacement therapy to prevent osteoporosis; immunizations to prevent diseases such as influenza and tetanus; drugs to prevent the contraction of contagious diseases and disease-progression in HIV-positive patients; drugs used exclusively by males to prevent benign prostatic hypertrophy; and drugs used exclusively by males for erectile dysfunction.[6] The Plans also cover a variety of medical *services* that the Plaintiffs describe as preventive, including routine physical exams, cancer screening tests; smoking cessation treatment; and yearly dental exams and teeth cleaning.[7]

The Plans have exclusions and limitations related to fertility, infertility and family planning, such as exclusions for sterilization procedures and for procedures that facilitate pregnancy.[8] The Plans also exclude coverage for prescription contraception to prevent pregnancy.[9] All six available methods of prescription contraception are used exclusively by women: oral contraceptives ('the pill"); intrauterine devices ("IUD"); Depo Provera

---

[5] Second Declaration of Geneva S. Dourisseau, Filing No. 194, Ex. 2 ("Dourisseau Decl. II") paragraphs 2, 4, 5, and 6, and Ex. A and B to Dourisseau Decl. II; Declaration of Kevin Potts, Filing No. 194, Ex. 9 ("Potts Decl. I"), paragraph 4, and Ex. A and B to Potts Decl. I.; and Filing No. 194, Ex. 3, 4, and 7.

[6] Second Declaration of Timothy Emr, Filing No. 194, Exhibit 6 ("Emr. Decl. II"), paragraph 2; Potts Decl. I, paragraph 8; Declaration of Leon Speroff, M.D., Filing No. 118, Exhibit B ("Speroff Decl."), paragraphs 5 and 6; U.P. Brief, pp. 10, 12-13.

[7] Speroff Decl., paragraphs 5-6; Dourisseau Decl. II, paragraph 9; Potts Decl. I, paragraph 4.

[8] Dourisseau Decl. II, paragraph 5; Potts Decl. I, Ex. A, p. 21, paragraph q.

[9] Dourisseau Decl. II, paragraph 7; Potts Decl. I, paragraph 5.

3

injections; barrier methods (diaphragm and cervical cap); the contraceptive patch; and the contraceptive ring.[10]  Coverage is available for prescription contraceptives through the Plans only if ordered for a "non-contraceptive purpose," such as the treatment of skin diseases or menstrual disorders.[11]

## STANDARD OF REVIEW

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The proponent need not, however, negate the opponent's claims or defenses.  *Id.* at 324-25.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts."  *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby,*

---

[10] Speroff Decl. paragraph 8 and footnote 7.

[11] Dourisseau Decl. II, paragraph 7; Potts Decl. I, paragraph 5; Second Declaration of Kevin Potts, Filing No. 194, Exhibit 11 ("Potts Decl. II"), paragraphs 2-4.

4

*Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id.* at 249-50 (citations omitted).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp.*, 477 U.S. at 327(quoting Fed. R. Civ. P. 1).

## ANALYSIS

*Statutory Framework*

Title VII, at 42 U.S.C. § 2000e-2(a), provides:

It shall be an unlawful employment practice for an employer – (1) . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ; or (2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . .

The PDA, at 42 U.S.C. § 2000e(k), provides:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.  This sub-section shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided*, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

Congress enacted the PDA in 1978 to overrule the Supreme Court's decision in *General Electric Co. v. Gilbert,* 429 U.S. 125 (1976), holding that an employer's denial of

5

coverage for pregnancy-related conditions in an otherwise comprehensive health insurance plan did not violate Title VII. In the subsequent case of *Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-79, n. 17 (1983), the United States Supreme Court acknowledged that the legislative history of the PDA demonstrates that Congress viewed the dissenting opinions in *Gilbert* as expressing the true principle and meaning of Title VII. The *Newport News* Court observed that the *Gilbert* dissents were grounded in the belief that a company's insurance plan that treated employees differently based on their *risk* of pregnancy, as well as the actual condition of pregnancy, discriminated on the basis of sex in violation of Title VII. *Newport News*, 462 U.S. at 678, citing *Gilbert,* 429 U.S. at 160 (Brennan, J., dissenting) and 429 U.S. at 161-62 n.5 (Stevens, J., dissenting). Similarly, in *U.A.W. v. Johnson Controls, Inc.,* 499 U.S. 187 (1991), the Court found that classifying employees on the basis of childbearing capacity, whether or not they were pregnant, "must be regarded, for Title VII purposes, in the same light as explicit sex discrimination." *Id.* at 199.

Because the PDA plainly states that its protection from discrimination, including discrimination in "receipt of benefits under fringe benefit programs," applies to "women affected by pregnancy" and not merely to *pregnant* women, the clear language of the statute requires that the Plans treat the *risk* of pregnancy no less favorably than the Plans treat other similar health risks.

*Persuasive Authorities*

On December 14, 2000, the Equal Employment Opportunity Commission ("EEOC") declared its policy regarding an employer's responsibility to provide coverage for prescription contraceptives for women when the employer's health plan provides

6

comprehensive coverage for other drugs and preventive medical services.[12]  It is the EEOC's position that the exclusion of coverage for prescription contraceptives violates Title VII, as amended by the PDA.  The EEOC's policy is not binding on this Court, but is entitled to some deference, because the EEOC is the administrative body responsible for enforcement of Title VII and the PDA.  *See, e.g., Bragdon v. Abbott*, 524 U.S. 624, 642 (1998)("[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40 (1944)))*; EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 115 (1988)("The EEOC's interpretation of Title VII, for which it has primary enforcement responsibility . . . need only be reasonable to be entitled to deference."); *Holthaus v. Compton & Sons., Inc.*, 514 F.2d 651, 653 (8th Cir. 1975)("Regulations issued by the [EEOC] in furtherance of [Title VII] are entitled to great deference by the courts.")

In 2001, a federal court addressed this issue for the first time, granting summary judgment for the plaintiff employees.  *Erickson v. Bartell Drug Co.*, 141 F.Supp.2d 1266 (W.D. Wa. 2001).  In *Erickson*, the court considered "whether the selective exclusion of prescription contraceptives from defendant's generally comprehensive prescription plan constitutes discrimination on the basis of sex."  *Id.* at 1268.  The court concluded that "when an employer decides to offer a prescription plan covering everything except a few specifically excluded drugs and devices, it has a legal obligation to make sure that the resulting plan does not discriminate based on sex-based characteristics and that it provides equally comprehensive coverage for both sexes."  *Id.* at 1272.

---

[12] Declaration of Roberta Riley ("Riley Decl."), Filing No. 118, Ex. A.

7

In 2003, the identical issue was addressed within this Circuit. *Cooley v. DaimlerChrysler Corp.*, 281 F.Supp.2d 979, 981 (E.D. Mo. 2003). The court recognized that "[p]otential pregnancy, unlike infertility, is a medical condition that is sex-related because only women can become pregnant." *Id.* at 984, quoting *Krauel v. Iowa Methodist Medical Center*, 95 F.3d 674, 680 (8th Cir. 1996). The court also recognized that facially-neutral practices may form the basis of Title VII claims. *Cooley,* 281 F. Supp. 2d at 986, citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971), and *Chambers v. Omaha Girls Club, Inc.,* 834 F.2d 697, 700 (8th Cir. 1987). Because that plan's exclusion of prescription contraceptives had a disparate impact[13] on women, the court concluded that the plaintiffs had established a prima facie case of discrimination under Title VII. *Cooley*, 281 F. Supp. 2d at 986.

Although the EEOC decision and the *Erickson* and *Cooley* opinions are not binding on this Court, I fully concur with their reasoning and logic, with one caveat. All three make note of the fact that prescription contraceptives are used only by women. While that fact is interesting, and remains true at this time, it is inconsequential for the resolution of the issue before the Court.

***Unpersuasive Arguments***

The Plaintiffs and Union Pacific have presented a variety of arguments in support of their respective positions. I will briefly note why certain arguments are unpersuasive.

<u>Social Impact of Unplanned Pregnancies</u>

The Plaintiffs and Amici Curiae reasonably point out the negative social and economic consequences of unplanned pregnancies on women, children, and society in

---

[13] I recognize that, in this case, the Plaintiffs' First Cause of Action alleges disparate treatment, rather than disparate impact.

8

general. These "enormous costs . . . for the mother, the child, and society as a whole" are also described in *Erickson*, 141 F. Supp.2d at 1273. While I recognize those costs, I have considered only *Union Pacific's treatment of the Plaintiffs themselves,* in the denial of prescription contraceptive coverage. I leave the social consequences of unplanned pregnancies for discussion in the legislative arena.

*Financial Impact and Per Capita Expenditures*

Union Pacific argues that "there are potentially huge ramifications to requiring coverage of gender-specific drugs and medical services" because "the growing cost of health insurance is a real concern for both employers and employees." (U.P. Brief, p. 40). Union Pacific also notes that its per capita expenditures for women under the Plans exceed its per capita expenditures for men. (Report of David Ogden, Filing No. 194, Exhibit 15 ("Ogden Report") at 6-7;[14] U.P. Brief, p. 37). Plaintiffs argue that the cost of medical services related to unplanned pregnancies far exceeds the cost of prescription contraceptives, and that Union Pacific would save money by providing coverage for prescription contraceptives. (Plaintiffs' Rebuttal Brief, Filing No. 201, pp. 21-22).

While Union Pacific may incur some net increase in cost if prescription contraceptives are covered under the Plans, such costs cannot justify discrimination under Title VII or the PDA. *Arizona Governing Committee v. Norris*, 463 U.S. 1073, 1085 n. 14 (1983)("[T]he greater cost of providing . . . benefits for women as a class cannot justify differential treatment based on sex."); *Newport News,* 462 U.S. at 683 n. 26 ("Because the

---

[14] I am also not persuaded that Mr. Ogden's conclusions are reliable based on the methodology described in his report. It is not apparent whether he considered the fact that certain medications and services available to both males and females under the Plans may be used more heavily by males. For example, treatment for nicotine and alcohol addictions are available under the Plans. According to U.S. Department of Health and Human Services 2004 statistics, 25% of men, but only 20% of women smoke; 10% of men, but only 3% of women are heavy alcohol users; and 31% of men, but only 15% of women engage in binge drinking. National Center for Health Statistics, Health, United States, 2004 at pp. 223, 228, 238-40.

9

[PDA] expressly states that exclusion of pregnancy coverage is gender-based discrimination on its face, it eliminates any need to consider the average monetary value of the plan's coverage to male and female employees.").

*Denial of Prescription Contraceptives for Men and Women as "Equal Treatment"*

Union Pacific argues that a "health plan that excludes all contraceptive benefits for both men and women is, on its face, equal treatment." (U.P. Brief, p.2). Union Pacific asserts that "what contraception actually controls is *fertility* – the ability to conceive." (*Id.*, p. 4).

Union Pacific's own expert, Suzanne L. Lowry, M.D., recognizes that only *women* have the ability to *conceive*. (Second Report of Suzanne L. Lowry, M.D., Filing No. 194, Ex. 8 ("Lowry Report II") ¶ 19). Conception is by definition the fertilization of the ovum, which takes place inside a woman's body, leading to pregnancy if the developing embryo becomes implanted in the woman's endometrium. (*Id.*, ¶¶ 19-20). Health plans that deny coverage for *fertility* treatments or for *sterilization* may apply equally to men and women, and not violate Title VII and the PDA. *Krauel*, 95 F.3d at 679-80. Health plans that deny coverage for *contraception*, by definition, affect only the health of *women*.

Union Pacific also asserts that the arrival of prescription male contraceptives is imminent, and that such a development will force the Plaintiffs "to concede that a gender-neutral exclusion of all prescription contraceptives (used purely for contraceptive purposes) is not discriminatory." (U.P. Brief, p. 41, citing Report of Dr. John Amory, Filing No. 194, Ex. 17 ("Amory Report") at 3-5). "A male pill would immediately nullify plaintiffs' claims," Union Pacific contends. (U.P. Brief, p.7).

It is true that the Plaintiffs place some emphasis on the fact that prescription contraceptives are presently available for use only by women. A male contraceptive,

10

however, simply prevents conception and pregnancy in the *female* partner. A male contraceptive, used for contraceptive purposes, has no beneficial impact on the health of the male.[15] Even if a male prescription contraceptive were available, Union Pacific's exclusion of coverage for prescription contraceptives for men and women would still affect only the health of women.

*Fertility as "Unrelated to Pregnancy and Childbirth"*

Union Pacific argues that because both males and females are naturally fertile, fertility cannot be said to be "related to" pregnancy and childbirth. (U.P. Brief, pp. 21-23).

Although some prescription contraceptives do affect fertility (*e.g.*, "the pill"), others prevent conception (*e.g.*, barrier methods), and others prevent implantation of fertilized ova (*e.g.*, the IUD). All have the purpose of *eliminating or reducing the potential for becoming pregnant*. "Potential pregnancy, unlike infertility, is a medical condition that is sex-related because only women can become pregnant." *Krauel*, 95 F.3d at 680. The Plaintiffs contend, and Union Pacific does not deny, that without contraception the average woman is likely to become pregnant 12 to 15 times over the course of her reproductive life, and, in any given year, 85 out of 100 sexually-active women of childbearing age will become pregnant.[16] Contraception, and the lack thereof, are very much related to the risk of pregnancy.

---

[15] Males prescription contraceptives would promote health only in the way that the isolation of Mary Mallon promoted health in 1915. It did nothing to enhance the health of "Typhoid Mary," but it was a great relief to other New Yorkers.

[16] *Standridge v. Union Pacific*, 8:03cv437, Complaint, paragraph 19, and Amended Answer, paragraph 19. *See also* Speroff Decl., paragraph 9.

11

*Prevention vs. Treatment*

Union Pacific argues that some of the drugs and services that the Plaintiffs describe as "preventive" are really *treatment* for medical conditions. (U.P. Brief, pp. 10-13, 35-36). For example, Union Pacific argues that medications to lower blood pressure and cholesterol are not *preventive*, but are simply *treatment* for the medical conditions of high blood pressure and high cholesterol. (*Id.* at p. 11, 36).

Of course, many diseases have multiple causes, or may be caused by a combination of factors, and one disease often leads to another. For example, medical *treatment* for the conditions of high blood pressure and high cholesterol may *prevent* the more serious conditions of heart disease or stroke. Once high blood pressure or high cholesterol have been *treated* through prescription medications, continuing prescription medications may be necessary to *prevent* those conditions from recurring. Similarly, a medical device such as a stent may be used to open a blocked artery, *treating* that condition, but also *preventing* a heart attack.

According to Union Pacific's expert witness, Dr. Lowry, the primary "epidemiological definition" of "prevention" is "[i]dentifying and eliminating the cause of disease."[17] It is clear that the Plans cover a variety of medicines and medical services designed to eliminate the causes of diseases and conditions that pose far less of a threat to health than does pregnancy.

**Comparative Health Risks**

Union Pacific argues that because fertility is "normal," contraception is not "medically necessary." (U.P. Brief, pp. 21-22). There is no doubt that fertility, conception and

---

[17] Lowry Report II, paragraph 5. According to Dr. Lowry, pregnancy is caused by female fertility, fertilization of the ovum, and implantation of the fertilized ovum in the endometrium. Lowry Report II, paragraphs 19-21.

12

pregnancy in the adult human female are normal,[18] and may be highly desired for their procreative result. There is also no doubt that pregnancy is a condition that has a profound impact on a woman's health.

Union Pacific's expert witness, Dr. Lowry, astutely observes that "[t]he male . . . psycho-social attitude toward illness and the treatment thereof, is substantially different from the female response and attitude."[19] Because there is no male analog for pregnancy, I will use a sex-neutral hypothetical in an attempt to bridge the gender gap-in-attitude toward the prevention and treatment of illness. The hypothetical disease[20] affects both men and women, and is unrelated to procreation:

> Our typical patient becomes aware that he[21] has contracted the disease when he experiences extreme fatigue, accompanied by nausea and vomiting. These symptoms diminish after a few months, as his abdomen begins to distend. Pressure on his bladder requires that he urinate frequently. He feels hot and sweaty, and has headaches and dizziness. As his digestive tract slows, he becomes constipated and suffers heartburn and hemorrhoidal symptoms. His weight increases by twenty per cent, with most of the gain centered in his abdomen, altering his balance and causing strain and discomfort in his lower back. His breasts, ankles, and feet swell, and his legs cramp. His mobility, his sleep, and even his breathing are impaired as his abdomen expands to twice its normal circumference. Stretch marks appear on his thighs, chest and abdomen. The ligaments in his hips and pelvis soften, and he develops sciatica, causing tingling and numbness. After nine months, he feels the onset of intense, intermittent pain, accompanied by diarrhea and nausea. His pain increases and accelerates over approximately 15 hours as his genital opening, usually the size of a

---

[18] Disease, degeneration and death are also "normal," and may even benefit the species under some theories of natural selection. See The Origin of the Species by Charles Darwin, Chapter IV (1859); Guns, Germs and Steel by Jared Diamond, pp. 77-78, 123 (1999). That fact provides little solace to the individual affected.

[19] Lowry Report II, paragraph 15.

[20] "Disease" is "a disorder of structure or function in a human . . . esp. one that produces specific signs or symptoms or that affects a specific location and is not simply a direct result of physical injury." New Oxford American Dictionary (2001). The word's root means simply "lack of ease." *Id.* In referring to the hypothetical condition as a "disease," I in no way intend to disparage the miracle of birth. Pregnancy, *but for* its priceless procreative product, however, *is* a disease.

[21] I will use the male pronoun that, as in Title VII, includes the female.

13

pencil lead,[22] is stretched to a diameter of 10 centimeters.  Surgical incisions are used to facilitate the opening of his genitals.  His pain may require general anesthesia, but usually can be managed through other methods, such as injections in the fluid surrounding his spinal cord.  He is encouraged to reject pain medication entirely so he can remain alert to assist in the treatment of his disease.  The incisions and tears in his genitalia are closed with internal and external sutures.  His breasts continue to swell, and his nipples become sore.  Healing of his genitals takes about six weeks, during which time his pain may be relieved by sitz baths, heat lamps, ice packs, and anesthetic sprays.  Finally, he has a heavy bloody discharge from his genitals, lasting several weeks.

Results may vary.[23]  Our typical patient is fortunate that he does not develop diabetes (a risk of about 3 per cent); dangerously high blood pressure (a risk of about 7%); clinical depression (a risk of about 15%); or require open abdominal surgery (a risk of about 25%).[24]  Even with abdominal surgery, he runs only a minor risk of death (.02%).[25]

Now that the condition of pregnancy has been described in sex-neutral terms to reduce the gender gap-in-attitude toward the condition, the question is whether the Plans treat women who have the risk of pregnancy less favorably than the Plans treat other people.  That is, do the Plans cover medicines or medical services to prevent employees from developing diseases or conditions that pose an equal or lesser threat to employees' health than does pregnancy?

---

[22] Both the male urethra and the female cervical canal, in their un-dilated states, have diameters of only a few millimeters.  (Gray's Anatomy, 1918, Ch. XI, paragraphs 3b.4 and 3d.3).

[23] The symptoms used in the hypothetical case are common symptoms of pregnancy, childbirth, and postpartum recovery.  See The Gale Encyclopedia of Medicine, 1999 ed. ("Gale Encyclopedia"), Vol 4.; Fundamentals of Human Sexuality by Herant Katchadourian, M.D., and Donald Lunde, M.D., 2nd ed., 1975, Chapter 5; Mayo Clinic Complete Book of Pregnancy & Baby's First Year ("Mayo Book of Pregnancy"), 1994; and The Harvard Guide to Women's Health, by Karen J. Carlson, M.D., Stephanie A. Eisenstat, M.D., and Terra Ziporyn, Ph.D. (2004). .

[24] Gale Encyclopedia, supra, Vol. 4, pp. 1287, 2337, 2327, 647, respectively.  See also Mayo Book of Pregnancy, pp. 189-91, 192, 332, 426.

[25] Gale Encyclopedia, p. 649; Mayo Book of Pregnancy, p. 329.

14

There is some evidence that at least one of the Plans covers prescription medication for male-pattern baldness.[26] The Plans provide prescription medication for male erectile dysfunction when "medically necessary to persons over 18 years of age and in limited quantities of 8 pills over 21 days at retail and 36 pills per 90 days at mail."[27] The Plans also provide prescription medications to lower blood pressure, reduce cholesterol, replenish hormones, reduce nicotine dependence, prevent allergic reactions, and immunize against flu, tetanus, rubella, and childhood diseases. The Plans further provide routine physical examinations to prevent a wide variety of health problems, and routine dental services to prevent dental disease such as tooth decay. It is clear that the Plans *do* cover a variety of medications and medical services designed to prevent diseases or other medical conditions that pose an equal or lesser threat to employees' health than does pregnancy.

## CONCLUSION

Union Pacific's policy of excluding prescription contraceptives and related outpatient services from its Plans violates Title VII, as amended by the PDA, because it treats medical

---

[26] Union Pacific's expert witness describes male pattern baldness as a "gender-specific anatomic and pathologic" condition. "Male pattern baldness requiring therapy includes medications such as Proscar and Rogaine." Lowry Report II, paragraph 16 e. See also Plaintiffs' Reply in Support of Motion for Partial Summary Judgment (Filing No. 201) p. 22; Supplemental Declaration of Roberta Riley, Filing No. 201, Ex. A, Attachment 8, noting that Minoxidil (the medication sold in the U.S. under the tradename Rogaine) is on the "Formulary List" of one of the Plans; Filing No. 194, Ex. 9B. According to The Harvard Medical School Guide to Men's Health, by Harvey B. Simon, M.D. (2004)("Harvard Guide"), however, "[m]ale pattern baldness is not a disease; the only consequences are cosmetic and the only complications are psychological. . . . The only reason to treat hair loss is to improve appearance and self-esteem." *Id.* at 460-61.

[27] U.P. Brief, pp. 10, 12-13; Emr Decl. II, paragraph 2; Potts Decl. I, paragraph 8. Erectile dysfunction has a wide variety of physical and psychological causes. See, *e.g.*, Gale Encyclopedia, *supra*, Vol. 3, pp. 1600-01; Harvard Guide, *supra,* pp. 298-302; Symptoms, by Isadore Rosenfeld, M.D., 1989, Ch. 10. Although erectile dysfunction is a condition with serious consequences, it is not one that poses a risk to health. "No one has yet died or suffered demonstrable damage from lack of sexual activity as such." (Fundamentals of Human Sexuality, *supra*, at 198). "There may be much to be said for regular sexual outlets, but the indispensability to physical health remains to be demonstrated." (*Id.* at 370). The fact that the Plans cover prescription medications for erectile dysfunction only upon the arrival of the patient's eighteenth birthday confirms the impression that such medications are not treatment for a condition that poses any threat to the patient's health, beyond the disability itself.

care women need to prevent pregnancy less favorably than it treats medical care needed to prevent other medical conditions that are no greater threat to employees' health than is pregnancy.

IT IS ORDERED:

1. The Plaintiffs' Motion for Partial Summary Judgment on First Claim for Relief (Filing No. 182) is granted;

2. At the conclusion of this case, a declaratory judgment will be issued in favor of the Plaintiff Class, reflecting the Court's finding that the Defendant Union Pacific Railroad Company's policy of excluding all FDA-approved prescription contraception from its health insurance coverage for agreement employees violates the Plaintiffs' civil rights as guaranteed by 42 U.S.C. § 2000e; and

3. The Magistrate Judge will set a progression conference or issue a briefing schedule and determine whether an evidentiary hearing may be needed on issues of injunctive relief, damages, and attorneys fees.

DATED this 22nd day of July, 2005.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge